**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **KYLE ISKE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **NO. 3:24-CV-02180-O** |
| | § | |
| **PRECISION DYNAMICS INTERNATIONAL, LLC,** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

**OPINION AND ORDER**

Before the Court is the motion of Defendant, Precision Dynamics International, LLC ("PDI"), for summary judgment. Having considered the briefing, the record, and applicable authorities, the Court concludes that the motion should be **GRANTED**.

## I. BACKGROUND[1]

Plaintiff is a male born on November 9, 1957.[2] He began working for Defendant on or about September 1, 2008, as a product sales trainer/facilitator in an area encompassing North Texas, Oklahoma, northwest Arkansas, southwest Missouri, and southern Kansas.[3] Through an agreement with Nissan North America ("NNA"), Defendant provided an in-market training/facilitation program known as Nissan BEST ("NBEST") emphasizing product knowledge, presentation, and sales process.[4] Throughout his relationship with Defendant, Plaintiff signed on almost an annual basis a Nissan BEST Program independent contractor agreement similar to the

[1] These facts are established by the summary judgment evidence or otherwise undisputed.
[2] Pl.'s Am. Pet. ¶ 6.1, ECF No. 3-1.
[3] Pl.'s Am. Pet. ¶ 6.2, ECF No. 3-1.
[4] Pl.'s Am. Pet.. ¶ 6.3, ECF No. 3-1.

last one he signed on April 1, 2022.[5] The agreement set forth his relationship with Defendant, his duties, and how he would be paid.[6] In particular, the agreement provided:

> In accordance with the mutual intentions of PDI and you, this Agreement established between PDI and you an independent contractor relationship, and all of the terms and conditions of this Agreement shall be interpreted in light of that relationship. There is no intention to create by this Agreement an employer-employee relationship. You shall have no claim against PDI hereunder or otherwise for vacation pay, sick leave, retirement benefits, social security, worker's compensation, health or disability benefits, unemployment insurance benefits, or employee benefits of any kind.[7]

Defendant did not withhold taxes; it paid Plaintiff's invoices for services and issued him Form 1099s.[8] Defendant's obligations under the agreement automatically terminated if Plaintiff breached the agreement, if Plaintiff through his acts or omissions disrupted the program or adversely affected the program or the performance or morale of NNA or Defendant's other contractors, or if Plaintiff performed any act of dishonesty, misrepresentation, or fraud tending to bring NNA or Defendant into disrepute.[9]

In June 2022, Plaintiff and other facilitators were in Chicago for a corporate event and dealer training.[10] On a morning drive to the event, Plaintiff and Mark Gunsten were in the car with two females, Ashley Carey and Sherril Harris, who expressed their displeasure with the Supreme Court's decision overturning *Roe v. Wade* by using profane language that Plaintiff thought was inappropriate and offensive.[11] On another day driving to the event, the same participants discussed the expense of doing laundry at a laundromat.[12] Carey had not gone to the laundromat and said

[5] Def.'s App. 30–31, 59–65, ECF No. 19.
[6] Def.'s App. 30–31, ECF No. 19.
[7] Def.'s App. 63–64, ECF No. 19.
[8] Def.'s App. 55–56, ECF No. 19.
[9] Def.'s App. 60, ECF No. 19.
[10] Pl.'s Am. Pet. ¶ 6.6, ECF No. 3-1.
[11] Pl.'s Am. Pet. ¶ 6.6, ECF No. 3-1; Pl.'s App. 3, ECF No. 22.
[12] Pl.'s App. 3, ECF No. 22.

that she was wearing the same shirt as the day before.[13] Plaintiff remarked that it was okay because he liked dirty girls.[14]

On July 2, 2022, Carey sent an email to Wayne Baetz, the training manager, complaining about sexual remarks Plaintiff had made to her that had made her so uncomfortable and distressed that she was losing sleep and needed help.[15] She described three events:

> (1) Plaintiff was holding a pool noodle and teasingly asked if Carey wanted to fight. She responded, "Careful, I have a gun" because she was working with a tape gun at the time. Plaintiff said, "I'm gonna stick this in your ear . . ." then leaned over and said, "or other places."
> (2) Plaintiff asked if Carey was going to the laundromat and when she said she was not, he began commenting in a suggestive tone that he liked a dirty girl. Carey said that Plaintiff's tone was so disturbing that Gunston immediately raised his voice to chastise Plaintiff for his impropriety.
> (3) Plaintiff had pulled her aside and told her she looked "so f***ing hot" that he wanted to leave his wife and marry her.[16]

Carey said that these were but three examples of Plaintiff's "generally creepy behavior" towards her and that it had become so distressing that she did not know what to do.[17]

Baetz notified Kevin Long, Defendant's president, and together they decided to transfer Plaintiff to the West Coast team.[18] On or about July 2, 2022, Baetz had two telephone calls with Plaintiff to address the complaints and tell him he was being transferred to the West Coast team.[19] Baetz expressly instructed Plaintiff not to discuss Carey's complaint or the reason for the transfer with Nissan or anyone else or his contract would be terminated.[20] Plaintiff admitted that he

---

[13] Pl.'s App. 3–4, ECF No. 22.
[14] Pl.s' App. 4, ECF No. 22.
[15] Def.'s App. 80–81, ECF No. 19.
[16] Def.'s App. 80–81, ECF No. 19.
[17] Def.'s App. 81, ECF No. 19.
[18] Def.'s App. 56, 77, ECF No. 19.
[19] Def.'s App. 78, ECF No. 19.
[20] Def.'s App. 78, ECF No. 19.

discussed the matter with Dan Tons of Nissan so Baetz terminated Plaintiff's contract.[21] In fact, he admitted that he made vulger or offensive remarks, complaining in his notes that "the ladies" could make them "but not ME."[22] By letter dated July 19, 2022, Defendant confirmed the termination of Plaintiff's agreement.[23]

Following the termination of Plaintiff's contract, Defendant contracted with Cliff Heathcote on August 15, 2022, to cover the Texas market previously assigned to Plaintiff.[24] Heathcote was born in October 1966, making him 55 years old in July 2022.[25]

On January 11, 2023, Plaintiff filed a charge of discrimination alleging discrimination based on sex, age, and retaliation with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission ("TWC").[26] Plaintiff requested and received a "Notice of Right to File a Civil Action" and timely filed his petition in state court.[27] He then filed an amended petition, which Defendant removed to this Court on the basis of diversity jurisdiction.[28] Plaintiff asserts claims for sex and age discrimination under Section 21.051 of the Texas Labor Code, and for retaliation under Section 21.055 of the Texas Labor Code.[29]

[21] Def.'s App. 33, 78, 90, ECF No. 19.
[22] Def.'s App. 89, ECF No. 19. Plaintiff had complained about comments made by Nissan training director Nikole Reed on July 15, 2022, that he thought were vulgar and inappropriate but Baetz told him she could get away with it because she was Defendant's client. Pl.'s App. 4–5, ECF No. 22.
[23] Def.'s App. 67–68, ECF No. 19.
[24] Def.'s App. 56, ECF No. 19.
[25] Def.'s App. 56, ECF No. 19.
[26] Def.'s App. 20, 50–53, ECF No. 19.
[27] Plaintiff's petition reflects that he received authorization to pursue "claims of sex discrimination and retaliation." Pl.'s Am. Pet. ¶ 5.3, ECF No. 3-1. The parties do not address whether he also received authorization to pursue age-related claims but apparently assume that he did.
[28] Def.'s Not. of Removal, ECF No. 1; Def.'s Am. Not. of Removal, ECF No. 3 (reflecting facts supporting diversity jurisdiction).
[29] Pl.s' Am. Pet. §§ 7–9, ECF No. 3-1.

## II. APPLICABLE LEGAL PRINCIPLES

The Court must grant summary judgment on a claim or defense if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The movant bears the initial burden of pointing out to the Court that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). The movant can discharge this burden by pointing out the absence of evidence supporting one or more essential elements of the nonmoving party's claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. Once the movant has carried its burden, the nonmovant must identify specific evidence in the record and articulate the precise manner in which that evidence supports his or her claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). The nonmovant cannot satisfy this burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

## III. ANALYSIS

### A. Employment Relationship

To prevail on his claims, Plaintiff must establish that he had an employment relationship with Defendant.[30] *Harbor America Central, Inc. v. Armand*, 692 S.W.3d 777, 784 (Tex. App.—San Antonio 2024, pet. denied). To determine whether an employment relationship exists, courts apply a hybrid economic realities/common law control test having two components: economic realities and right to control. *Univ. of Tex. at El Paso v. Ochoa*, 410 S.W.3d 327, 331 (Tex. App.—

[30] Defendant concedes that it meets the statutory definition of employer under the Texas Labor Code. Def.'s Br. Summ. J. 11, ECF No. 18.

El Paso 2013, pet. denied). The economic realities component of the test considers whether the alleged employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment. *Id.* at 331–32. The control component focuses on whether the alleged employer had the right to hire, fire, supervise, and set the alleged employee's work schedule. *Id.* at 332. The control component is the more important. *Id.*

Here, the record reflects that Plaintiff was a facilitator and trainer for Defendant's customer, Nissan. Although Baetz served as Plaintiff's supervisor, Plaintiff recognized that Nissan was, in effect, his supervisor—"I mean, there was no doubt about who was in charge. It was Nissan people."[31] As training manager, Baetz acted as a liaison between Defendant's clients, Nissan, Mercedes, and Kia, and the trainers, taking care of scheduling conflicts and dealer issues that came up.[32] He would create a preliminary calendar or schedule that would be finalized when the trainer approved it.[33] The job of the trainer was to go to dealerships and teach salespeople the specifications, nuances, and how the technologies in the vehicles worked. The client, in this case, Nissan, would train the trainers at events called "T-3" meetings that occurred five or six times a year.[34] Defendant furnished all the equipment the trainers needed and reimbursed them for all expenses they incurred.[35] It was up to the trainers to decide how best to use the training materials at different dealerships.[36] Plaintiff was paid a monthly fee pursuant to his contract, which required that Plaintiff had to pay all applicable taxes; he had no right to vacation pay, sick leave, retirement benefits, social security, worker's compensation, health or disability payments, unemployment

[31] Def.'s App. 11, ECF No. 19.
[32] Pl.'s App. 58–59, ECF No. 22.
[33] Pl.'s App. 63–64, ECF No. 22.
[34] Pl.'s App. 60–62, ECF No. 22; Def.'s App. 6, ECF No. 19.
[35] Pl.'s App. 81–85, ECF No. 22.
[36] Pl.'s App. 74–76, ECF No. 22.

insurance benefits, or employee benefits of any kind.[37] The contract between Plaintiff and Defendant clearly reflected the intent that Plaintiff operate as an independent contractor and not as an employee.[38]

The undisputed evidence weighs in favor the conclusion that Plaintiff was an independent contractor. As in *Lalik v. Roadrunner Dawes Freight Sys. Inc.*, No. 4:07-CV-152-A, 2008 WL 1868320, at *3 (N.D. Tex. Apr. 22, 2008), that Defendant would tell Plaintiff "what, when, and where" is a red herring. Defendant did not tell Plaintiff how to perform his work; rather, he had to determine what would work best at the dealerships where he provided training.[39] That Plaintiff was awarded unemployment benefits by the TWC is not dispositive because its findings are not binding on the Court and may not be used as evidence. *Williams v. Aviall Servs., Inc.*, 76 F. App'x 534, 536 (5th Cir. 2003) (citing TEX. LABOR CODE 213.007).

**B. Age Discrimination**

Even if Plaintiff had been able to raise a genuine fact issue as to his status as employee rather than independent contractor, he still could not prevail. To determine whether he can make out a claim of age discrimination, the Court applies the *McDonnell Douglas*[40] framework. *Dabbasi v. Motiva Enters., L.L.C.*, 107 F.4th 500, 505 (5th Cir. 2024). First, Plaintiff must establish a *prima facie* case by showing that he was discharged; he was qualified for the position; he was within the protected class at the time of discharge; and, he was replaced by someone outside the protected class or someone younger or was otherwise discharged because of his age. *Id.* If the Plaintiff makes the showing, the burden shifts to the Defendant to provide a legitimate, non-discriminatory reason

[37] Def.'s App. 59, 63–64, ECF No. 19.
[38] Def.'s App. 63–64, ECF No. 19.
[39] Pl.'s App. 75–76, ECF No. 22.
[40] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

for the termination. If Defendant does so, the burden shifts back to Plaintiff to show that the Defendant's reason for his termination was pretextual. *Id.*

Here, the sole basis for Plaintiff's age discrimination claim is that he was replaced by someone nine years younger. Although both were in the protected class, that is, at least forty years of age, the issue is whether nine years counts as "substantially younger." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996). Inasmuch as the Fifth Circuit has stated that a five-year age difference is a close question, the Court is satisfied that Plaintiff has made out a *prima facie* case. *See Flanner v. Chase Inv. Servs. Corp.*, 600 F. App'x 914, 919 (5th Cir. 2015). He fails at the third step, however, because Defendant has shown that Plaintiff's termination was solely motivated by Plaintiff's failure to comply with the instruction that he not discuss the reason for his being moved to the West Coast, which he admits that he did. Plaintiff argues that Defendant gave inconsistent or conflicting reasons for its conduct, citing *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 594 (5th Cir 2007). ECF No. 21 at 26. As in *CIBA*, however, Defendant has not provided inconsistent or conflicting reasons for terminating Plaintiff. Carey's complaints triggered the decision to transfer Plaintiff and the resulting instruction not to discuss the matter with Nissan or anyone else.

**C. Sex Discrimination**

To establish a claim for sexual harassment, Plaintiff must show that the workplace was "permeated with discriminatory intimidation, ridicule, and insult [so] sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Mere uncivil conduct is not actionable. *Id.*. To prove a hostile work environment based on sex, Plaintiff must show: (1) he belonged to a

protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his membership in the protected class; and (4) the harassment affected a term, condition, or privilege of employment. *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 806 (5th Cir. 1996).

In support of his sex discrimination/hostile environment claim, Plaintiff relies on allegations that: (1) females repeatedly subjected him to unwanted hugs, and (2) females were able to get away with making vulgar and offensive remarks. ECF No. 21 at 28–30. As to the first allegation, Plaintiff contends that beginning in 2008, women routinely initiated hugs at the T-3 training events. He did not consider it appropriate in a corporate setting and it made him feel uncomfortable.[41] It was females at Nissan that started the tradition of hugging everyone.[42] Plaintiff complained to his supervisor, Steve Hail, who told him not to make a big deal out of it and that he might be labeled a troublemaker or complainer. After Hail was terminated, Plaintiff complained to his replacement, Mark Goodman.[43] Plaintiff has not pointed to any evidence showing when he complained to Goodman or whether any of his complaints about unwanted hugging took place withing the 300-day limitation period for discrimination claims. Moreover, he did not check the "continuing action" box on his charge.[44] *See Roper v. A.E. Moore Constr., Inc.*, No. 2:02-CF-302 (DF), 2006 WL 8441385, at *3–*4 (E.D. Tex. June 9, 2006). In any event, the record makes clear that the hugging happened to every participant who did not act to avoid it and was not based on sex.[45]

---

[41] Def.'s App. 12–13, ECF No. 19.
[42] Def.'s App. 5, 11–12, ECF No. 19.
[43] Pl.'s App. 3, ECF No. 22.
[44] Def.'s App. 50, ECF No. 19.
[45] Def.'s App. 9–10, ECF No. 19.

As for the alleged offensive remarks, the record likewise reflects that they had nothing to do with sex. Nor were they directed to Plaintiff. They were merely vulgar remarks. In one instance, the remarks were a response to a Supreme Court ruling.[46] In another, a Nissan training director was apparently commenting about how hard Defendant's facilitators work.[47] Plaintiff has not shown how these remarks created a hostile work environment or in any way affected a term, condition, or privilege of employment (assuming he had established an employment relationship). Nor has he created a genuine fact issue as to whether he was treated differently than female colleagues. The remarks Plaintiff is alleged to have made were directed to a particular female and there is no reason to believe that he was disciplined based on the inclusion of one vulgar term in his alleged comments.[48] Rather, he was reassigned so that Defendant could investigate whether he had engaged in sexual harassment.[49] He was terminated for speaking about the reason for the reassignment despite having been instructed not to do so.[50]

**D. Retaliation**

To establish a *prima facie* case of retaliation, Plaintiff must show: (1) he engaged in a protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the filing of the claim and the adverse action. *Newbury v. City of Windcrest*, 991 F.3d 672, 678 (5th Cir. 2021); *Esparza v. Univ. of Tex. at El Paso*, 677 S.W.3d 115, 125 (Tex. App.—El Paso 2023, no pet.). Retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Johnson v. Bd. of Supervisors*, 90 F.4th 449, 460 (5th Cir. 2024). For all the reasons

[46] Pl.'s App. 3, ECF No. 22. It is notable that Plaintiff did not complain about the remarks until after he had been reassigned to the West Coast.
[47] Pl.'s App. 4–5, ECF No. 22. Again, the complaint was not made until after Plaintiff had been reassigned. Moreover, the remark was made by Defendant's client.
[48] *See* Def.'s App. 80–81, ECF No. 19 (email regarding Plaintiff's comments).
[49] Pl.'s App. 96–99, ECF No. 22.
[50] Def.'s App. 33, 78, 90, ECF No. 19.

previously discussed, Plaintiff is unable to make out a *prima facie* case, but even if he could, he has not shown that Defendant's reason for terminating him was pretext for discrimination.

## IV. CONCLUSION

For the reasons discussed, Defendant's motion for summary judgment is **GRANTED**; Plaintiff take nothing on his claims; and, such claims are **DISMISSED WITH PREJUDICE**.

**SO ORDERED** on this **4th day** of **November 2026**.

Reed O'Connor
CHIEF UNITED STATES DISTRICT JUDGE